*239 By the COURT.
Slosson, J.
That the loss of the vessel is to be attributed, primarily, to the negligence and carelessness of the crew, or of such portion thereof as were at the time especially entrusted with its safety, we think on the evidence there can be no reasonable doubt — but as the proximate or immediate cause of the disaster was a peril insured against, the defendants would be liable if not discharged on other grounds. (Gates v. Madison Co. Mer. Ins. Co. 1 Seld., 478; Mathews v. Howard Ins. Co. 1 Kernaut.)
The true question, and the only one which we deem it necessary to consider at length, is, whether the vessel was unseaworthy at the commencement of the voyage, by reason of the conceded incompetency of. the master, (Captain Greene,) as a navigator, there being, nevertheless, another person on board, (Captain McNeil,) to whom was especially entrusted by the owner the duty of navigating the ship, and who is admitted to have possessed competent skill for that purpose. The question is entirely a novel one, and its solution must depend on a correct application of the general principles upon which the doctrine of seaworthiness rests. The implied warranty of sea-worthiness has its foundation in sound principle, and involves the element of good faith as between the contracting parties. The consideration of the contract as respects the insured is indemnity against extraordinary perils. As respects the insurer, it is the chance of gaining the premium; and to enable him to do this, the ship must be in a condition, when the policy attaches, to resist ordinary-perils and to accomplish the voyage under ordinary risks; and so essential is this, that the law does not require any express covenant' ' on the subject, but absolutely avoids the contract, if in fact this state of sea-worthiness does not exist. The law implies, from the very nature of the contract, an undertaking on the part of the insured that the vessel shall be capable of performing the voyage, and the violation or breach of this undertaking, technically termed a warranty, and which is, in effect, a condition precedent, defeats and puts an end to the contract, whether the loss be attributable to the unseaworthy condition of the vessel or not. The whole consideration fails as respects the insurer, and in the intendment of the law the contract never existed, the risk had never an inception. (1 Marsh. Ins. ch. 5, §§ 1, 8 ; T. R. 192.)
*240 To constitute this sea-worthy condition; the vessel- must be tight, staunch and strong — she must be equipped with everything essential to her navigation during the voyage, and she must have a sufficient crew, both as to .numbers and efficiency; and last, though by no means least, she must have a master' or commanding officer of competent skill, prudence and experience, at least, to conduct the navigation of the vessel, if not to meet the responsibilities of those sudden and decisive emergencies in which by his own act he often determines the rights and liabilities of. the parties to the contract. (1 Marshall, above cited; Park. Ins., ch. 11; 7 T. R. 160; 3 Kent, 7th ed., 356-7; 5 Mass. Rep.; 11; 1 Arnould’s Ins., 684.)
In every definition of sea-worthiness to be found in the books, a master , of competent skill is invariably included. It is contended in the present case, and for the first time, -it is believed, that if the-skill be present, it is by no means essential to the warranty that it reside in the master, and that it equally answers the requirements of the condition, if it be found in another officer or person entrusted with the navigation simply. It-is said that this does not dispense with the necessity of a commanding officer known as master or captain; but thát the duties of'the latter extend to a variety of objects other than that of mere navigation, and that a vessel may be as well navigated by another person of equal skill as by the master himself; and that as the warranty requires only that the vessel shall be in a condition to accomplish the voyage under ordinary perils, it is substantially complied with when the requisite qualifications to successful navigation are present, however distributed as to persons. That, for example, a vessel is as sea-worthy within the meaning of the warranty, with a master unskilled in navigation, but with a competent sailing-master, or other person to conduct the navigation, on board, as though the master were himself possessed of all the necessary qualifications of a skilful navigator as in the case at the bar. It may well be doubted whether it is not a sufficient answer to this to say that a contrary understanding of the nature and definition of sea-worthiness having, for a long time, if not always, prevailed, the parties may be said to have contracted in reference to the latter, and that the defendants are now precluded from setting up a different interpretation of their engagement. *241 But apart from this, there are considerations which, in our judgment, render this novel theory untenable. It is as essential to success in the navigation of a vessel that the person, 'whoever he may be, who is entrusted with it, should be clothed with the requisite authority to enforce his commands, as that he should possess the necessary skill in the science itself. The nature of the employment requires perfect subordination on the part of the seamen and inferior officers. The exigencies of the navigation itself frequently require not only consummate skill and presence of mind on the part of the person conducting it, but the exercise of an absolute authority, which calls for, and can enforce, immediate and unquestioning obedience. “ The service in which he (the master) is employed is one of uncommon peril, not only requiring great skill, but often demanding great promptitude of decision and action, and admitting no time of delay for deliberation, reasoning or expostulation. Upon him is imposed the obligation to meet and provide for those emergencies, and if there is not an instantaneous obedience to his orders, it may involve the loss of the ship and of all who are in it.” (Flanders, 85, §54.)
Hence, it is requisite that both essentials — the skill and the authority — should be united in the same person; otherwise, in the emergency which calls for their exercise, the catastrophe to be avoided, might become inevitable. Indeed, so palpable is this truth, that the able counsel who advocated the doctrine in question were forced to admit that with the nautical skill must be combined the power of discipline; but they contended that this power did actually reside in McNeil, acting either by a deputed authority from Greene, or by authority derived from the owner of the vessel, and that disobedience to McNeil contrary to the orders of Greene, would be disobedience to the master himself, and of course punishable as such. There is no evidence that McNeil acted by any deputed authority from Greene, even if the latter could depute such an authority. His whole power was derived from the commission which he held from Draper, the owner of the vessel. But apart from this, the theory of the plaintiff’s counsel requires that Greene should acquiesce in, and enforce, the orders which McNeil was to give; and it virtually concedes that in the absence of such acquiescence, or of unan *242 imity 'bet-ween them, the skill might become inoperative from the want of the necessary authority to enforce its orders.
Until therefore, it is shown that Greene, as master, was nnder a necessity of enforcing the orders which McNeil as navigator might give to the seamen and subordinate officers, the whole theory lacks the only element which can give it plausibility. Such, then, being the necessity of authority combined with skill, in the person entrusted with the navigation of the vessel, the warranty, when it calls for the skill, calls also for the authority, and whoever be the officer, or person, in whom the latter resides, must be the one to possess the former, within the meaning of the contract. The law for the protection of commerce, with all its entrusted interests of property and life, has wisely clothed one person, and but one, with all the authority requisite to the security of those interests, and the successful discharge of the hazardous duties involved in the navigation of the vessel,- and that person is the master. Not only does the general maritime law give him this authority, but express statutes have defined and in some instances enlarged it; and have moreover, prescribed penalties for disobedience, and established through the medium of shipping articles, a contract between the master and seamen, which creates mutual rights and obligations. (1 Stat. at large, 1790, ch. 29.)
Among other things these statutes provide, that a seaman who has not signed these articles, shall not be bound by the regulations, nor subject to the penalties and forfeitures contained in the act, and which regulations, penalties, and forfeitures, are prescribed for the more effectual protection of the authority of the master, as well as the rights of the seaman; neither could he be guilty of desertion within the meaning of the statute, which defines that offence to be, the absenting of himself by a seaman who has signed a contract for the voyage, without leave of the master, or officer commanding in the absence of the master. There are also statutes providing for the punishment of mutiny against the master, and for the punishment of the master himself, who, in a foreign port, forces a seaman on shore. (Act March 3, 1835, vol. 4; Stat. at large, p. 775 ; Act March 3, 1825, same vol. p. 115.)
The shipping articles are to declare the voyage, and the time for which the seamen are shipped; and it has been held, that in *243 case of a deviation in the voyage so declared, a refusal by the crew to perform duty is justifiable, and not a revolt within the meaning of the statute of 1835. (United States v. Matthews, 2 Sumner, C. C. R. 470; Abbot on Shipping, Story & Perkins’ edition, 244.)
It is true, the contract created by the shipping articles, though entered into between the master and seamen, is not confined to the original master with whom the voyage is commenced, but extends to any other who may in the course of the voyage, be substituted in his place; yet the party so substituted must be one succeeding to the entire authority and office of master. (United States v. Cassidy, 2 Sumner, C. C. R. 582.)
The power of punishment rests, nnder the general maritime law, exclusively with the master, while on board, nor can a mate or other subordinate officer inflict punishment on the seamen when the master is on the vessel, except by his authority, express or implied, and if such punishment should be inflicted when the master is present and can prevent it, and does not, he is personally responsible. (U S. v. Taylor, 2 Sumner, C. C. R., 584; Flanders on Shipping, 85, §§ 53 and 99, §§ 72-3.) It is true an emergency may occur, in which for the general safety it may become necessary that a subordinate officer should enforce immediate obedience to his own orders by the exercise of violent or forcible means, but (in the language of Judge Story) “ this is not so much a punishment for the offence of disobedience as a necessary means of compelling the performance of duty at the very moment when it is necessary to enforce prompt and immediate obedience.” Neither can the master delegate to any subordinate officer a general authority to inflict punishment at his own pleasure for the offences of the crew; the master stands in some respects in the relation of a parent to the crew, “ and is bound to exercise his own judgment as to the time, the manner, and the circumstances under which punishment is to be inflicted on the crew for any past misdemeanors, or any present misdemeanors not immediately and materially affecting the ship’s service or security.” The power of dismissing or removing a seaman rests solely with the master; (3 Kent, 7th ed., 237,) and it is his authority, directly, or subordinately, in the inferior officers, when on duty, to which they owe obedience. Nor is this power of removal confined to *244 the case of the seamen only, but in a proper case the master may remove the subordinate officers also. (Thompson v. Busch, 4 Wash. C. C. R., 338; 3 Kent, 237.)
This authority of the master over the crew and subordinate officers rests not alone upon the necessity of preserving discipline on board the ship, nor exclusively upon the contract between himself and the seamen by virtue of the shipping articles, but it has its origin, partly, in the fact, that the master is himself personally responsible to his owners and to others for his conduct, as master, for any injury or loss to the ship or cargo, by reason of his own negligence or misconduct, or that of the men whom he employs. This responsibility attaches to him by virtue of the supremacy of his office, and it is true of no other officer in the ship. It has its analogy in the responsibility which attaches to the supreme head in all governments, and, as in the case of the latter, finds its compensation in the authority which accompanies it, over those for whose conduct the responsibility exists. (3 Kent, 235; Abbot, 231; Flanders on Shipping, § 65; Stone v. Kelland, 1 Wash. C. C. R., 142.)
If such be the nature and authority of the office of master, and such the relations between himself and crew; and if it be true, as is most evident, that the skill and the authority must be both united in the same person, then it is manifest that the warranty of sea-worthiness is not complied with, when the authority is all in the master, and the skill in a subordinate person. This would be true, were such subordinate person an officer known to the law, such as first mate, the next highest in authority; but the truth of the proposition becomes more palpably manifest when the person in whom the skill resides, occupies so anomalous a position as that held by Oapt. McNeil. His duties were those of a sailing-master, an office familiar in the naval service, but entirely unknown to the mercantile marine.
In case of the death or absence of the master, or the occurrence of any event by which he is rendered incompetent to the discharge of his duties, the right and authority of the officer devolve on the next in command, the first mate, an office known to and recognized by the law. (Copeland v. The New England Marine Ins. Co., 2 Metcalf, 432.) The seaman ships subject to this very contingency, and well knowing and understanding, and assenting *245 to the rule; but the nondescript office of sailing-master, he knows nothing of, and is not bound to recognize, either bj the usages of the service, the maritime law, or his contract with the master. This very vessel was provided with a first and second mate, upon whom, in order, would have devolved the navigation and command of the vessel in the event of the death of Captain Greene. Suppose this contingency to have happened on the voyage, could McNeil have claimed the right to succeed him ? Could he have contested this right with the chief mate ? Allowing that his commission gave him some rights, they certainly gave him no such right as this.
The law of the marine, with which alone the insurer has to do, gives the right of succession to the next officer in rank, and no private arrangement between the owner and McNeil, not known and assented to by these defendants, could have affected their right to claim that the master should be succeeded by a competent officer, clothed by law with' the necessary authority to enforce discipline. McNeil would have occupied in respect to the mate, precisely the position which he had sustained in relation to the master. Obedience would have been due, not to him, but to the mate, and his position would continue to be what it had ..been from the first — an anomalous post of duty, without responsibility or power. If this view be correct, and if, as it seems to be conceded, the mate was a competent seaman, then in what respect as regards sea-worthiness, does the case differ from what it would have been, had the vessel left New York without McNeil on board ? The skill to navigate would in such case have been equally present in the person of the mate, and with the advantage of his possessing some authority, and the right to claim the success sion in case of the master’s decease; and yet, can it be pretended that the vessel would, under such circumstances, have been, deemed sea-worthy within the meaning of the warranty ?
But there is a broader aspect in which I think this doctrine of' sea-worthiness, as respects the master, may well be regarded. When the powers and duties of this office, apart from the exercise of mere nautical skill, are taken into consideration, some of them involving the power of fixing the liability of the insurer himself, it is clear to my mind, that the parties, when they enter into the contract, contemplate in the warranty of sea-worthiness, in its ap *246 plication to the master, not merely a skilful navigator, but a person of sufficient experience in bis calling, and of adequate judgment and prudence, to be equal to those emergencies in -which, by his official acts, he may determine the liabilities of the parties. Take for illustration, the familiar instances of a technical total loss and a jettison. In the first, it is within the power of the master to sell the vessel, a power which he must exercise upon his own judgment of his owner’s election to abandon. It may present a case of extreme difficulty; the master is called to act, not upon certainties, but upon probabilities; and if he acts upon a correct estimate of these probabilities, he would be justified in abandoning, although the vessel be afterwards repaired at less than the estimated expense. A jettison, properly made, fixes the liability of the insurer in general average; the propriety of making it, is to be determined by the master alone, although he is at liberty to consult with his officers. The crew have no authority in the premises; it is a right, the exercise of which, requires great judgment in determining the degree of necessity.
A master may be a competent seaman, so far as skill in navigating the vessel is concerned, and yet totally destitute of that judgment which would make him equal to a crisis like either of those just referred to; and while it may be admitted that the mere absence of a high degree of judgment and discretion in the master, who is nevertheless possessed of general nautical skill, would not, of itself, render a vessel unseaworthy, yet the necessity of these qualities as a means of protection to the insurer, shows that the warranty in question is with him a matter of substance and not of form — and that it embraces a range of qualifications of which nautical skill, while it may be the most indispensable, is nevertheless, not the only one. It is in the general capacity, experience, and qualifications of the master — his ability safely to navigate the vessel, and encounter the imminent risks of his employment, and his capacity to understand, choose, and decide, in those extreme issues, in which the decision of the instant, determines forever the liability of the insurer — that the latter relies for the attainment of the only object which influences him in entering into the contract, the chance of earning the premium. He does not contract (in the absence of evidence to the contrary) to insure a voyage conducted by a landsman as master, though assisted in *247 the navigation, by a skilful person, appointed for that purpose ; and especially may it be said that he cannot, with any semblance of truth, be held to have so contracted, when the assistant in question occupies a post of duty unknown to. commercial usage and law, and wholly without authority over the crew. An incompetent master, with a powerless assistant, are not enough to satisfy the requirements of this condition, and it would he introducing a dangerous principle into the law of insurance to hold the insurer under such circumstances liable.
There is not a particle of evidence to show that the defendants in these cases had the slightest intimation of the arrangement in respect to the employment of Greene and McNeil, when the vessel left the port of New York. They had no reason to expect such an arrangement, and in all probability would have refused to insure had they known it; and to hold the warranty complied with under these circumstances, would not only be a dangerous innovation in the well understood principles of marine insurance, but a violation of good faith in fact, as respects the defendants. Judgment must be for the defendants in both cases.